IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
                             )
SAMUEL L. COIL               )
                             )
     Plaintiff,              )
                             )
     v.                      )          1:07CV145
                             )
HUBERT PETERKIN,             )
JACKIE BREWINGTON,           )
BARBARA McDUFFIE             )
                             )
     Defendants.             )
```

**<u>MEMORANDUM OPINION AND ORDER</u>**

OSTEEN, JR., District Judge.

In this action Plaintiff, a state inmate proceeding <u>pro se</u>, filed a complaint against three prison officials. (<u>See</u> Compl. (Doc. 2).) Presently before the court is Defendants' Motion for Summary Judgment. (Doc. 29.) The United States Magistrate Judge issued a Memorandum Opinion and Recommendation ("MAR"), recommending that this court grant Defendants' motion. (Doc. 45.) Plaintiff filed timely Objections. (Doc. 47.)

As required by 28 U.S.C. § 636(b)(1), this court has conducted a <u>de novo</u> review of the portions of the MAR to which objections were filed. This court agrees with the MAR's recommended disposition of Defendants' motion. For the reasons set forth herein, Defendants' Motion for Summary Judgment will be granted.

## I. Procedural History

On February 23, 2007, Samuel L. Coil ("Plaintiff") filed a 42 U.S.C. § 1983 action against three Hoke County Jail officials: Hubert Peterkin, Hoke County Sheriff; Jakie Brewington, former Chief Jailer in the Hoke County Sheriff's Office; and Barbara[1] McDuffie, former Sergeant in the Hoke County Sheriff's Office (collectively, "Defendants"). (Compl. (Doc. 2); Defs.' Br. in Supp. (Doc. 30-1) 1.)[2] Plaintiff alleges that Defendants, acting in their official and individual capacities, violated his constitutional rights during his pretrial incarceration at the Hoke County Jail from October 15, 2004 to June 14, 2006. (Compl. (Doc. 2); Defs.' Br. in Supp. (Doc. 30-1) 1; Peterkin Aff. (Doc. 30-7) ¶ 5.) In general, Plaintiff claims that Defendants violated his rights by acting deliberately indifferent to his medical needs, failing to provide him with adequate legal materials, opening his mail outside his presence, denying him access to a telephone and religious and reading materials, administering an inadequate grievance process, failing to provide inmates adequate means to contact officers during emergencies,

---

[1] It appears from the record, that the spelling of "Barbra" in the Complaint was an oversight and the correct spelling is "Barbara."

[2] Plaintiff's complaint is unnumbered and is accompanied by hundreds of unnumbered attachments. (See Compl. (Doc. 2).)

2

and not affording him an opportunity to exercise outdoors. (Compl. (Doc. 2).)

Before bringing suit, Plaintiff filed approximately 119 complaints with the Hoke County Jail. (See Compl. (Doc. 2) (submitted grievance forms attached to complaint).) Plaintiff did not formally appeal any of his complaints, as he failed to designate "appeal" on his complaints as required by the Hoke County Inmate Grievance System Policy. (See id.; see also Defs.' Br. in Supp. Ex. Q (Doc. 30-8) 2 ("In order for a grievance to be processed, the inmate must. . . [designate] [w]hether the form is being filed as a 'grievance' or an 'appeal.'").) However, several of Plaintiff's complaints were sent directly to Defendant Peterkin and noted that jail officials had not yet responded to the complaints he previously filed. (See Compl. (Doc. 2) (grievance dated 05/01/06, titled "No Answers to Grievances" and addressed to Defendants).)

Plaintiff received few written responses to his complaints from jail officials. (See id.; see also Defs.' Br. in Supp. Ex. Q (Doc. 30-8) 3 ("The Chief Jailer will investigate all inmate grievances and provide a written response to the inmate within five (5) working days of the date the complaint was received." (emphasis in original)).) Further, none of those responses contained all of the information required by the jail's complaint policy. (See Compl. (Doc. 2); see also Defs.' Br. in Supp. Ex. Q

3

(Doc. 30-8) 3 ("The [written] response will include the following information: 1.) Agreement or disagreement with the inmate's complaint; 2.) An explanation or reason for how this conclusion was reached; and, 3.) Any action they [sic] may have been or will be taken to correct the problem or situation, if applicable.").)

On March 10, 2008, Defendants filed a Motion for Summary Judgment, arguing that Plaintiff failed to exhaust his administrative remedies, had not proven that the constitutional violations he alleged were the result of an official policy or custom, and did not establish the necessary elements of his various claims. (See Defs.' Mot. for Summ. J. (Doc. 29); Defs.' Br. in Supp. (Doc. 30-1).) On December 3, 2008, the Magistrate Judge issued a MAR, recommending that this court grant Defendants' motion on the ground that Plaintiff failed to exhaust his administrative remedies. (MAR (Doc. 45) 10.)[3] On December 12, 2008, Plaintiff filed objections to the MAR. (Doc. 47.)

## II. Facts

Plaintiff's complaint raises several unrelated claims. (See Compl. (Doc. 2).) The court will summarize the facts upon which each of Plaintiff's claims is based in turn.

---

[3] This is the only ground for granting Defendants' motion discussed in the MAR. (See Doc. 45.)

**4**

**A. Medical Needs**

Plaintiff's claim that Defendants acted deliberately indifferent to his medical needs is based on three events or series of events.

**1. Dental Problems**

On October 25, 2004, Plaintiff awoke from his sleep as a result of commotion caused when one of his fellow inmates, William Barefoot, escaped from the prison. (Coil Dep. (Doc. 30-2) 39-40; Peterkin Aff. (Doc. 30-7) ¶ 15.) As Plaintiff climbed down his bunk bed, he slipped, bit his lip, and chipped several of his front teeth. (Coil Dep. (Doc. 30-2) 40.) After the immediate uproar from the escape subsided, Plaintiff informed an unidentified officer that he was in pain. (Id. at 40-41.) In response, the officer brought Plaintiff ibuprofen to relieve Plaintiff's pain until Plaintiff could be examined by a doctor. (Id. at 41) Plaintiff subsequently completed a medical request form, asking to be seen by a dentist. (Id.)

On November 4, 2004, Plaintiff was examined by Dr. Mark S. Thompson, a dentist that regularly provided services to inmates at the Hoke County Jail. (Id. at 41-42; Thompson Dec. (Doc. 30-6) ¶ 3.) At the meeting, Plaintiff complained to Dr. Thompson about pain he felt in his front teeth. (Thompson Dec. (Doc. 30-6) ¶ 4.) Upon examining Plaintiff, Dr. Thompson found that

Plaintiff had large cavities and lesions resulting from a chronic periapical infection. (<u>Id.</u> ¶ 5.) Dr. Thompson determined that Plaintiff's symptoms were the result of a long-term pattern of inadequate hygiene. (<u>Id.</u> ¶ 6.) He also concluded that Plaintiff's problems did not constitute a dental emergency and were not readily identifiable by lay persons. (<u>Id.</u> ¶ 7.) Dr. Thompson extracted several of Plaintiff's teeth, provided Plaintiff with penicillin, and wrote Plaintiff a prescription for pain medication. (<u>Id.</u> ¶ 9.)

Approximately three days later, after Plaintiff used all the prescription medication, Plaintiff began to feel pain again. (<u>See</u> Coil Dep. (Doc. 30-2) 44-45.) To address his pain, Plaintiff took ibuprofen given to him by jail staff. (<u>Id.</u> at 44.) Finding the ibuprofen inadequate, Plaintiff talked to jail medical staff and Defendant McDuffie about his condition. (<u>Id.</u> at 47.) The medical staff declined to prescribe Plaintiff additional medication. (<u>Id.</u>) Plaintiff then repeatedly asked to be examined by Dr. Thompson again. (<u>Id.</u> at 45.)

On December 20, 2004, Plaintiff visited Dr. Thompson for a second time. (Thompson Dec. (Doc. 30-6) ¶ 10.) This time, Plaintiff complained of pain on the lower left side of his jaw. (<u>Id.</u>) After examining Plaintiff, Dr. Thompson determined that Plaintiff suffered from an inflamed red sore, bone loss, and a periapical lesion. (<u>Id.</u>) To treat Plaintiff, Dr. Thompson

removed several more of Plaintiff's teeth and gave Plaintiff penicillin and a prescription for pain medication. (Id. at 13.) Dr. Thompson once again concluded that Plaintiff's ailments arose from a long-term pattern of inadequate dental hygiene. (Id. at 11.) He further concluded that Plaintiff's condition did not constitute a dental emergency and was not readily identifiable by lay persons. (Id. at 12.)

When Plaintiff returned to the Hoke County Jail, Defendant McDuffie informed Plaintiff that his prescription could not be filled because it was too late in the day. (Coil Dep. (Doc. 30-2) 37.) Although Defendant McDuffie told Plaintiff that his prescription would be filled the next day, it was not filled until two days later. (Id.) However, Plaintiff was given ibuprofen while he waited for his prescription to be filled. (Id. at 38.)

On December 28, 2004, Plaintiff returned to Dr. Thompson's office for a third visit. (Thompson Dec. (Doc. 30-6) ¶ 14.) During this visit, Dr. Thompson resolved Plaintiff's dental pain by soothing out a bone on Plaintiff's lower anterior arch. (Id.; Coil Dep. (Doc. 30-2) 49.)

### 2. Medication

Plaintiff alleges that jail officials gave him incorrect medication on several occasions. (Coil Dep. (Doc. 30-2) 30-36.) Plaintiff's claim is based on his observation that the medicine

7

tablets he received on some occasions looked different than the
tablets he normally received. (Id. at 30.) Plaintiff does not
know what medications he took or what conditions the medications
treated. (Id. at 32.) Although jail officials gave Plaintiff
his medication, Plaintiff never received medication from
Defendants. (Id. at 31-32.)

### 3. Insect Bites

Plaintiff asserts that he was repeatedly bitten by insects
during his incarceration. (Coil Dep. (Doc. 30-3) 90-91.) The
jail was treated for pests immediately prior to Plaintiff's
incarceration and six times during Plaintiff's stay. (Id. at 91;
Peterkin Dec. (Doc. 30-5) ¶ 13.) Plaintiff's cell was
specifically treated once. (Coil Dep. (Doc. 30-3) 94.) The
insect bites caused Plaintiff's skin to scar. (Id. at 73.)
Also, on one occasion Plaintiff felt nauseated and sick because
of the bites. (Coil Dep. (Doc. 30-3) 72-74.) However, the harm
caused by the bites was temporary and did not result in serious
or long-term damage to Plaintiff's health. (Id.) Further,
Plaintiff was given special soap and medication to address his
ailments. (Id. at 73-74.)

### 4. Back Mat

Plaintiff has experienced back pain since approximately
1990. (Id. at 66.) To help alleviate this pain, the jail
medical staff initially indicated that, if possible, Plaintiff

8

should receive two bed mats rather than one. (<u>Id.</u> at 67-68.)[4]
During a cell search, a second mat that Plaintiff was given was
taken away by jail officials. (<u>Id.</u> at 69.) In response, the
jail medical staff indicated that Plaintiff "must" receive two
mats. (<u>Id.</u> at 68.) Later, after Plaintiff was again given a
second mat, jail officials took Plaintiff's second mat away so as
to provide other inmates with at least one mat. (<u>Id.</u> at 69.)
Plaintiff claims that his rights were violated when prison
officials took the second mat away from him. (<u>See</u> <u>id.</u> at 66-71.)

### 5. Soft Food Diet

As stated, several of Plaintiff's teeth were removed while
he was incarcerated. (Thompson Dec. (Doc. 30-6).) This made it
difficult for Plaintiff to eat the food prison officials normally
served. (Coil Dep. (Doc. 30-3) 74.) Plaintiff claims that his
rights were violated because prison officials denied his requests
for a soft food diet. (<u>Id.</u>) When Plaintiff found it difficult
to eat the food prison officials served, he purchased soft food
from the prison canteen. (<u>Id.</u> at 75.) Although Plaintiff lost
ten to fifteen pounds as a result of the denial of his soft food
request, his health was not in danger. (<u>Id.</u> at 75-76.)

---

[4] Sometimes Plaintiff slept on a bunk bed. (Coil Dep. (Doc.
30-3) 66.) Other times he slept on the floor. (<u>Id.</u>)

### 6. Mental Health Treatment

Plaintiff claims that he has suffered from depression for over seventeen years. (_Id._ at 59-60.) On March 7, 2006, Plaintiff was examined by mental health professionals at Sandhills Center for MH, DD & SA Services ("Sandhills") for an initial consultation. (Mental Health Admission Assessment (Doc. 30-10) 6.) Sometime thereafter, Plaintiff scheduled a second appointment with Sandhills to followup on his initial visit. (_See id._ at 59.) Plaintiff claims that his rights were violated as result of jail officials failing to take him to his followup appointment. (_Id._ at 59.) Plaintiff's failure to attend his followup appointment did not cause him any physical injuries. (_Id._ at 61.) Plaintiff was never prescribed medications for his depression and he never attempted to commit suicide. (_Id._) Plaintiff claims that he would have been able to get along better with others if he was taken to his followup appointment. (_Id._)

### B. Jail Temperature

Plaintiff alleges that his rights were violated when he was subjected to cold temperatures in the jail as result of the jail's heater malfunctioning. (Coil Dep. (Doc. 30-3) 97.) On the occasions when the jail's heater did not work properly, the jail had the heating system repaired. (_See_ Compl. (Doc. 2) (notation on grievance dated 4/15/05, stating that the jail requested that the heater be repaired; notation on grievance dated 2/25/05,

10

stating that boiler was repaired); Peterkin Aff. (Doc. 30-7) ¶ 5 ("When [boiler] maintenance issues arise, jailers contact the Hoke County Public Buildings Department and request the necessary maintenance.").)

Plaintiff did not suffer from frostbite as a result of the jail's temporarily low temperature, (Coil Dep. (Doc. 30-3) 97-98), but he "might" have gotten a cold (Coil Dep. (Doc. 30-4) 105). The jail provided Plaintiff with extra blankets when the heater could not be readily repaired. (Coil Dep. (Doc. 30-3) 97-98; Coil Dep. (Doc. 30-4) 104.) Also, jail officials gave Plaintiff cold medication. (Coil Dep. (Doc. 30-4) 105.)

**C.  Legal Materials**

While incarcerated at the Hoke County Jail, Plaintiff wished to conduct legal research regarding his pending criminal matter and civil claims he contemplated asserting against the jail and jail officials. (Id. at 128-29.) Plaintiff maintains that he was unable to obtain adequate legal materials at the Hoke County Jail to conduct the research he desired. (Id. at 128.) Nevertheless, Plaintiff was represented by an attorney in his criminal matter. (Id.) Further, Plaintiff was able to, and did, correspond with North Carolina Prisoner Legal Services ("NCPLS"). (Id. at 130.)

11

**D.** **Legal Mail**

Plaintiff claims that officers at the Hoke County Jail opened his mail outside his presence. (Coil Dep. (Doc. 30-2) 124.) On or about August 7, 2005, Plaintiff's stepdaughter dropped off a letter for Plaintiff at the jail. (Id. at 122-23.) The letter was from the Hoke County Clerk of Court. (Id.) Plaintiff claims that Officer Manning opened the letter and read its contents outside his presence.[5] (Id.) Plaintiff also maintains that Officer Manning opened another letter addressed to him from attorneys representing his wife in their divorce proceedings. (Id. at 125, 128.)

On several occasions, various unidentified officers apologized to Plaintiff for accidentally opening his mail outside his presence. (Id. at 124.) However, Defendants are not alleged to have opened Plaintiff's mail. (Id. at 124.)

**E.** **Telephone Access**

Each cell block at the Hoke County jail had a telephone during Plaintiff's incarceration. (Coil Dep. (Doc. 30-4) 107-08.) Plaintiff used the telephone in his cell block a "couple times a week" to contact his family. (Id. at 108.) Plaintiff alleges that his rights were violated when prison officials denied him access to a telephone on several occasions. (See id.

---

[5] Officer Manning's first name is not contained in the record.

at 107-11.)  On one occasion, Plaintiff was denied access after another inmate "got upset and tried to rip [the phone] off the wall and broke the receiver."  (_Id._ at 109.)  On another occasion, the inmates in Plaintiff's cell block were denied telephone access when an inmate made threatening calls from the jail.  (_Id._ at 111.)

Jail officials provided inmates with cordless telephones when inmates' personal emergencies arose.  (_Id._)  However, jail officials did not make cordless telephones regularly available to inmates because of security concerns. (_Id._ at 110.)

### F.  <u>Religious and Reading Materials</u>

Prison rules generally allowed personal property to be sent to an inmate only from the inmate's family members.  (_Id._ at 112, 118-19.)  Plaintiff claims that his First Amendment rights were violated because these rules prevented him from receiving a Bible from his preacher.  (_Id._)

Despite the prison's rules, Plaintiff was permitted to buy a Bible from the prison canteen. (_Id._ at 113.)  Further, at least once a month Plaintiff was allowed to meet with his personal preacher or another preacher that visited the jail.  (_Id._ at 114, 117.)  In fact, on a number of occasions Defendant Peterkin allowed Plaintiff and Plaintiff's personal preacher to meet in his office.  (Peterkin Aff. (Doc. 30-7) ¶ 28.)  Moreover, subject

13

to availability, the visiting preacher provided inmates with free religious materials. (Id.)[6]

Additionally, Plaintiff claims that his rights were violated because he did not have adequate access to reading material. (Coil Dep. (Doc. 30-4) 131-32.) Although reading material was available to inmates from jail officials by request, Plaintiff maintains that the supply of material was not adequate to satisfy inmate demand. (Id. at 132.)

G.   **Adequacy of Grievance Process**

Plaintiff maintains that his rights were violated because the prison maintained an inadequate grievance process. (See Compl. (Doc. 2).) Plaintiff complains that jail officials frequently failed to respond to his grievances. (See id. (grievance titled "No Answers to Grievances" and dated 05/01/06).)

H.   **Jail Conditions**

Plaintiff alleges that his rights were violated because it was difficult for inmates to get the attention of jail officials during emergencies. (Coil Dep. (Docs. 30-2, 30-3) 62-63.) Although the prison had cameras that monitored inmate activity, Plaintiff maintains that officers should have been stationed closer to inmates' cells. (Id.)

---

[6] Prior to August 22, 2005, Plaintiff had a Bible that was brought to him by his then-wife. (Coil Dep. (Doc. 30-4) 117.) However, that Bible was later stolen. (Id. at 116.)

14

Similarily, Plaintiff claims that his rights were violated because he was not given an adequate opportunity to exercise outdoors. (<u>Id.</u> at 105-06.) Plaintiff contends that he was denied access to the jail's exercise yard because of a problem with the fence surrounding the jail. (<u>Id.</u> at 106-07.) The jail is located within thirty feet of a school. (<u>Id.</u> at 107.) All inmates, including Plaintiff, were provided access to a room in the jail which could be used for exercise. (Peterkin Aff. (Doc. 30-7) ¶ 25.)

**III. Legal Standard**

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates that no genuine issues of material fact exist, thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). If the moving party has met that burden, then the nonmoving party must persuade the court that a genuine issue remains for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a <u>genuine issue for trial</u>."

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (<u>quoting</u> Fed. R. Civ. P. 56) (citations and footnote omitted).

In considering a motion for summary judgment, the court is not to weigh the evidence, but rather must "determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986). The court must view the facts in the light most favorable to the nonmovant, drawing inferences favorable to that party if such inferences are reasonable. <u>Id.</u> at 255. However, there must be more than a factual dispute; the fact in question must be material, and the dispute must be genuine. Fed. R. Civ. P. 56(c); <u>Anderson</u>, 477 U.S. at 248. A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

## IV. Discussion

Defendants argue that they should be granted summary judgment in their favor because Plaintiff's action is impermissibly based upon the theory of <u>respondeat superior</u>; Plaintiff failed to establish the necessary elements of his various claims; Plaintiff failed to exhaust his administrative remedies; and Plaintiff did not establish that the constitutional violations he alleges were the result of an official policy or

16

custom of the Sheriff's Office.  (Defs.' Br. in Supp. (Doc. 30-1) 10-34.)[7]

## A.    **Theory of Respondeat Superior**

Defendants argue that they are entitled to summary judgment in their favor because Plaintiff's claims are based on the theory of respondeat superior.  (Defs.' Br. in Supp. (Doc. 30-1) 14-15.) "[Individual]-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law."  Graham, 473 U.S. at 165.  To establish liability in a individual capacity § 1983 action, the plaintiff must "show that the official, acting under color of state law, caused the deprivation of a federal right."  Id. at 166.  However, an official may not be held liable under § 1983 based upon a theory of respondeat superior.  See Fisher v. Wash. Metro. Area Transit Auth., 690 F.2d 1133, 1142-43 (4th Cir. 1982), abrogated on other grounds by Riverside v. McLaughlin, 500 U.S. 44 (1991).  Instead, for liability to attach to a defendant, the plaintiff must prove that the defendant personally engaged in the improper act alleged or the act was taken pursuant to an official policy or custom attributable to the defendant.  Id.

---

[7] Defendants' arguments do not distinguish between Plaintiff's individual and official capacity claims.  (See Defs.' Br. in Supp. (Doc. 30-1) 10-34.)

17

Likewise, with regard to official capacity suits, "a municipality cannot be held liable _solely_ because it employs a tortfesor." _Monell v. Dep't of Soc. Servs._, 436 U.S. 658, 691 (1978). "[I]n other words, a municipality cannot be held liable under § 1983 on _respondeat superior_ theory." _Id._ "Instead, it is when execution of a governments's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." _Id._ at 694.

Defendants Brewington and McDuffie are entitled to summary judgment on Plaintiff's claims. It is undisputed that Plaintiff seeks to hold Defendants liable based upon a theory of _respondeat superior_. Plaintiff's complaint alleges that Defendants are liable because of their "supervisor[y] indifference or implied authorization of subordinates." (Compl. (Doc. 2).) Also, Plaintiff admitted during his deposition that he brought his action against Defendants because they are the "bosses" of the jail. (Coil Dep. (Docs. 30-2, 30-3) 50-52.) No jury could reasonably conclude that the prison's policies are attributable to Defendants McDuffie or Brewington. There is no evidence that Defendants Brewington or McDuffie drafted or adopted the prison's policies. Moreover, since both defendants were lower level jail administrators, and there is no evidence that they had

policymaking authority, Defendant Brewington and McDuffie's acts cannot fairly be said to represent official municipal policy.

Similarly, Defendant Peterkin is entitled to summary judgment on Plaintiff's legal mail claim. With regard to Plaintiff's individual capacity clam against Defendant Peterkin, Plaintiff has neither alleged nor offered evidence tending to show that Defendant Peterkin opened or directed others to open Plaintiff's mail outside his presence. Concerning Plaintiff's official capacity claim against Defendant Peterkin, the record contains no evidence of a custom or policy, written or unwritten, that permitted jail officials to engage in such action.

However, unlike Defendants Brewington and McDuffie, Defendant Peterkin is not entitled to summary judgment on the balance of individual capacity claims against him merely because those claims are rooted in respondeat superior theory. There is a genuine issue of material fact as to whether the written prison policies that underlie Plaintiff's claims are attributable to Defendant Peterkin. Once again, as the Hoke County Sheriff, Defendant Peterkin "[r]eviewed and [a]pproved" the written prison policies and those policies bear his signature. (See Defs.' Br. in Supp. Ex. Q (Doc. 30-8).) From these facts a jury could

reasonably conclude that Defendant Peterkin was personally involved in the alleged infringement of Plaintiff's rights.[8]

Similarly, with the exception of Plaintiff's legal mail claim, summary judgment on Plaintiff's official capacity claims on repondeat superior grounds is inappropriate. Viewing the facts in the light most favorable to Plaintiff, Defendants have not met their burden of proving that Plaintiff seeks to hold Hoke County liable "solely because it employs" Defendants. Monell, 436 U.S. at 691 (emphasis in original). Instead, as previously stated, a jury could reasonably find Hoke County liable for injuries allegedly sustained by Plaintiff as a result of municipal policies created by Defendant Peterkin.

_____

[8] "Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Campbell v. Galloway, 483 F.3d 258, 270 (4th Cir. 2007) (quotation omitted). Immunity is a defense to liability, not an element of the plaintiff's prima facie case. Siegert v. Gilley, 500 U.S. 226, 231 (1991).
Defendants raised qualified immunity as a defense to liability, but did not explain the grounds upon which they contend that Plaintiff's rights were not clearly established. (See Defs.' Br. in Supp. (Doc. 30-1) 34.) Accordingly, Defendants have not met their burden of proving that they are entitled to summary judgment on qualified immunity grounds.

20

**B.  Elements of Various Constitutional Claims**

Defendants further argue that they are entitled to summary judgment because there are no genuine issues of material fact as to at least one element of each of Plaintiff's claims.  (See Defs.' Br. in Supp. (Doc. 30-1).)  This court agrees.

As a preliminary matter, this court notes that Plaintiff does not specify which of his constitutional rights were violated.  (See Compl. (Doc. 2).)  While it appears that Plaintiff's claims are generally rooted in the Eighth and First Amendments, his claims arose while he was detained pending trial.  "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."  Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979).  "The State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."  Id.  Therefore, the pertinent constitutional guarantee for the punishment of pretrial detainees is the Due Process Clause of the Fourteenth Amendment.  Id.  It is nevertheless clear that pretrial detainees "retain at least those constitutional rights that we have held are enjoyed by convicted prisoners."  Id. at 545.  Accordingly, this court will analyze Plaintiff's claims under the Eighth and First Amendments.

21

### 1.  Indifference to Medical Needs

"The Eighth Amendment's prohibition against cruel and
unusual punishment protects prisoners from the 'unnecessary and
wanton infliction of pain,' which includes 'deliberate
indifference to serious medical needs of prisoners.'"  <u>Hall v.
Holsmith</u>, No. 09-6288, 2009 WL 2171242, at *2 (4th Cir. July 21,
2009) (<u>quoting</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)).  "In
order to establish a claim of deliberate indifference to a
medical need, the need must be both apparent and serious, and the
denial of attention must be both deliberate and without
legitimate penological objective." <u>Grayson v. Peed</u>, 195 F.3d 692,
695 (4th Cir. 1999).  "'A serious medical need is one that has
been diagnosed by a physician as requiring treatment or one that
is so obvious that even a lay person would easily recognize the
necessity for a doctor's attention.'" <u>Wynn v. Mundo</u>, 367 F. Supp.
2d 832, 838 (M.D.N.C. 2005) (<u>quoting</u> <u>Creech v. Nguyen</u>, 153 F.3d
719 (4th Cir. 1998)).

Furthermore, "[d]eliberate indifference is a very high
standard – a showing of mere negligence will not meet it."
<u>Grayson</u>, 195 F.3d at 695.  "It requires that a prison official
know of and disregard the objectively serious condition, medical
need, or risk of harm." <u>Shakka v. Smith</u>, 71 F.3d 162, 166 (4th
Cir. 1995).

22

### a. Dental and Mental Health

Defendants are entitled to summary judgment on Plaintiff's dental and mental health-related claims because a jury could not reasonably conclude that Plaintiff had serious dental and mental health needs. Plaintiff had dental needs as a result of his inadequate dental hygiene and chipping his teeth. However, the only evidence as to the severity of Plaintiff's dental needs is Dr. Thompson's testimony that Plaintiff's dental conditions did not require immediate care and were not readily identifiable by lay persons. Similarly, there is no evidence that Plaintiff's alleged depression was severe. The only evidence as to the severity of Plaintiff's condition are his statements that he never attempted to commit suicide and he would have been able to get along better with others if he was taken to his followup mental health appointment. Plaintiff's mere assertions, standing alone, do not constitute sufficient evidence from which a jury could conclude that his dental and mental health needs were serious and Defendants caused him harm.[9] See Stickler v. Waters, 989 F.2d 1375, 1381 n.9 (4th Cir. 1993) ("The mere incantation of 'physical and mental injury,' of course, is inadequate to survive a motion for summary judgment.").

---

[9] Even assuming arguendo that Plaintiff suffered from depression, there is no evidence as to the severity of his condition.

### b.  Medication

Defendants are entitled to summary judgment on Plaintiff's improper medication claim.  There is no evidence that the alleged distribution of incorrect medication was anything more than a mistake.  As stated, negligence is not enough to sustain a deliberate indifference to medical needs action.  Grayson, 195 F.3d at 695.

### c.  Insect Bites

Defendants are likewise entitled to summary judgment on Plaintiff's insect bite claim.  First, there is no evidence that Plaintiff had a serious medical need as a result of his insect bites.  Plaintiff admitted that any harm caused by the bites was temporary and did not result in serious or long-term damage to his health.

Second, a jury could not reasonably conclude that Defendants acted deliberately indifferent to Plaintiff's alleged injuries. In addition to the jail being treated for pests six times during Plaintiff's stay, Plaintiff's cell was specifically treated once. Further, Plaintiff was given special soap and medication to relieve any bite-related pain he suffered.

### d.  Back Mat

Defendants are entitled to summary judgment on Plaintiff's back mat-related claim.  Jail medical staff eventually indicated that Plaintiff "must" receive two mats because of the condition

24

of his back.  Thus, viewing the facts in the light most favorable

to Plaintiff, a jury could reasonably conclude that Plaintiff had

a serious medical need.  However, Defendants had a legitimate

penological objective for denying Plaintiff two mats.  It is

uncontested that Defendants temporarily took away Plaintiff's

second mat so they could provide all prisoners with at least one

mat.  Allowing all inmates at least one mat is reasonably related

to the legitimate penological objective of ensuring the health

and welfare of inmates.  See Sample v. Angelone, No. 98-7421,

1999 WL 52347, at *1 (4th Cir. Feb. 5, 1999).

### e.  Soft Food Diet

Defendants are entitled to summary judgment on Plaintiff's

soft food diet claim.  As stated, there is no evidence that

Plaintiff's dental condition constituted a serious medical need.

Plaintiff admitted that although he lost weight as a result of

Defendants' denial of his diet request, his health was not in

danger.[10]

### 2.  Legal Materials

"[T]he fundamental constitutional right of access to the

courts requires prison authorities to assist inmates in the

preparation and filing of meaningful legal papers by providing

---

[10] Even assuming arguendo that Plaintiff's loss of weight
alone could be a basis for finding that he had a medical need,
there is no evidence that Defendants were deliberately
indifferent to that need.  Plaintiff was able to obtain the soft
food he desired from the prison canteen.

25

prisoners with adequate law libraries or adequate assistance from persons trained in the law." <u>Bounds v. Smith</u>, 430 U.S. 817, 828 (1997). To that end, the North Carolina Department of Corrections established the NCPLS to provide attorney assistance to North Carolina inmates. <u>Wrenn v. Freeman</u>, 894 F. Supp. 244, 247-48 (1995). Courts have held that this arrangement satisfies the Constitution's requirement that inmates be given meaningful access to the courts. <u>Id.</u> (collecting cases).

Defendants are entitled to summary judgment on Plaintiff's legal materials claim. Plaintiff was represented by an attorney during the pendency of his criminal matter. Further, Plaintiff has neither alleged nor offered evidence tending to show that the assistance he received from NCPLS was inadequate. In fact, NCPLS provided Plaintiff with the form he used to file his complaint. (Coil Dep. (Doc. 30-4) 130-31.) From these facts, a jury could not reasonably conclude that Plaintiff was deprived of meaningful access to the courts.

### 3. Access to Telephone and Religious and Reading Materials

Inmates are accorded "those [constitutional] rights not inconsistent with imprisonment itself or incompatible with the objectives of incarceration." <u>Hudson v. Palmer</u>, 468 U.S. 517, 523 (1984). "Prisoners must be provided reasonable opportunities to exercise their religious freedom guaranteed under the First Amendment." <u>Id.</u> at 523 (quotation omitted).

26

However, "there is no constitutional or federal statutory right to use of a telephone while in prison." United States v. Alkire, No. 95-7885, 1996 WL 166400, at *1 (4th Cir. Apr. 10, 1996). Further, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." O'Lone v. Estate of Shabazz, 482 U.S. 342, 439 (4th Cir. 1987) (quotation, brackets, and capitalization omitted). Courts consider several factors in determining the reasonableness a regulation: (1) the degree of the connection between the regulation and the government interest; (2) whether there are alternative means of exercising the right; (3) the impact accommodation of the asserted right will have on prison officials and other inmates; and (4) the absence of ready alternatives. Turner v. Safley, 482 U.S. 78, 90-91 (1987).

Defendants are entitled to summary judgment on Plaintiff's telephone access claim. Since inmates do not have a constitutional right to telephone access, Defendant's denial of telephone access to Plaintiff is not a ground upon which Plaintiff can be granted relief.

Similarly, Defendants are entitled to summary judgment on Plaintiff's access to religious and reading materials claims. A jury could not reasonably conclude that Plaintiff's First Amendment rights were infringed upon by Defendants. Even

27

assuming Plaintiff could not receive a Bible from his preacher, Plaintiff had numerous alternative means of obtaining a Bible and practicing his religion.  Specifically, Plaintiff could purchase a Bible from the prison canteen; subject to availability, the preacher that visited the prison distributed religious materials to inmates; and Plaintiff's family members could send him a Bible.  With regard to the availability of reading materials, Plaintiff has not presented any evidence indicating the he personally was not able to obtain specific reading materials he desired such that his rights were violated.

### 4.    Adequacy of Grievance Process

Defendants are entitled to summary judgment on Plaintiff's claim that they violated his constitutional rights by administering an inadequate grievance process.  "[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state." Adams v. Rice, F.3d 72, 75 (4th Cir. 1994).  Thus, the alleged inadequacy of the jail's grievance process cannot constitute a violation of Plaintiff's constitutional rights. See id.

### 5.    Jail Conditions

As discussed, Plaintiff has two claims regarding the conditions of the Hoke County Jail.  First, Plaintiff maintains that his rights were violated because he was not given an adequate opportunity to exercise outdoors.  Second, Plaintiff

28

contends that his rights were violated because it was difficult for inmates to contact jail officials during emergencies.

"[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." <u>Stickler v. Waters</u>, 989 F.2d 1375, 1381 (4th Cir. 1993). Likewise, in determining whether a restriction on an inmate's opportunity for physical exercise constitutes a cruel and unusual punishment in violation of the Eighth Amendment, the court "must look at the totality of the circumstances, including the extent to which the restrictions adversely affect the mental or physical health of the inmates." <u>Clay v. Miller</u>, 626 F.2d 345, 347 (4th Cir. 1980).

Defendants are entitled to summary judgment on Plaintiff's jail conditions claims. As to both claims, Plaintiff "has come forward with no evidence that he has sustained any serious or significant physical or emotional injury" as a result of the conditions. See <u>Stickler</u>, 989 F.2d at 1317. As previously discussed, there is no evidence that Plaintiff had any serious dental needs. Moreover, Plaintiff does not allege and has not offered any evidence tending to prove that his dental problems were exacerbated by prison officials' delay in addressing his needs.

29

Likewise, with regard to Plaintiff's outdoor exercise claim, "[t]his is not the kind of extraordinary case of palpable deprivation of the minimal requirements of civilized existence in which an inference of serious injury might be reasonable." See id. Although Plaintiff was not permitted to exercise outdoors because of security concerns, it is undisputed that he was given the opportunity to exercise inside the jail.[11]

**C.**   **Other Grounds for Summary Judgment**

Because Defendants are entitled to summary judgment for the abovementioned reasons, the court need not discuss the other grounds for summary judgment raised by Defendants.

**V.**   **Conclusion**

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 29) is **GRANTED.** A judgment dismissing this action will be entered contemporaneously with this Order.

---

[11] Even assuming arguendo that Plaintiff's temperature claim is a jail conditions claim, Defendants are entitled to summary judgment. The low temperature at the jail did not cause the Plaintiff to suffer from frostbite or any other serious injury. At best, Plaintiff "might" have gotten a cold. Moreover, jail officials provided Plaintiff with extra blankets when the jail was cool. See Stickler v. Waters, 989 F.2d 1375, 1382 (4th Cir. 1993) (stating that the district court properly granted summary judgment on the plaintiff's jail temperature claim because the inmates received blankets when the jail was uncomfortably cold).

30

This the 5th day of October 2009.

_____
United States District Judge

31